Court will call the case, please. And the attorneys, if you'd like to step forward and introduce yourselves. Good morning. My name is David Nordroth, N-O-R-D-W-A-L-L, on behalf of the website. Okay, thank you. Good morning. I'm Julie Tischer, along with Brian Hickey, and we're here on behalf of the defendants, Dr. Leipoff and Advanced Pain Centers. Tosha? Tischer. Tischer. Thank you very much. Also, on behalf of the plaintiff is also Peter Charton. Thank you. All right. Mr. Norvold? Thank you. How much time do you think you'll need, and then how much do you want to save for rebuttal? How much time can I have? We had one case today where students were not trying to rush anybody, but generally... I'll try to be brief, and we have 15 minutes, and possibly five in rebuttal. I'll try to abide by that and keep it short. Perfect. If you could keep in mind that we've all read the brief and read the record, and we're familiar with the case. Of course. May I please the court? This appeal presents two questions for the court. First of all, whether the trial court erred and abused its discretion in failing to grant a new trial after finding that it erred in instructing the jury on sole proximate cause. And second of all, whether the trial court erred in granting the JMOV based upon the absence of proximate cause. The answer to both questions is yes, and requires reversal of the trial court's orders and remand for a new trial. Starting with the sole proximate cause issue. The trial court probably found that it erred in getting a long-form sole proximate cause contained in 12-12.04 and a related special interrogatory. But it erred in finding that plaintiff was not entitled to a new trial. This is a clear abuse of discretion, which is the standard that's before the court. The Illinois Supreme Court has made clear that a sole proximate cause defense and related jury instructions are only appropriate when the defense seeks to defeat the plaintiff's claim of negligence by establishing proximate cause solely in the act of another not a party to a suit. And that's the McDonald case I believe cited in our brief as well. Where the conduct of a plaintiff is at issue in contributing to an injury, the sole proximate cause and jury instructions don't apply. Rather, the appropriate proximate cause instructions are the standard proximate cause definition in IPI 1501 and the appropriate contributory negligence instructions. The conduct of a non-party cannot, by definition, be the sole proximate cause of a plaintiff's injury if the plaintiff herself contributed to that injury. The trial court initially allowed overt plaintiff's objection to sole proximate cause instruction and related special interrogatory. Because it found that defense could argue that John's conduct in failing to more quickly contact 911 on the day of the overdose was sole proximate cause for death. Even though there was no affirmative defense on that issue. The trial court also allowed to submit a special interrogatory which basically tracked the language of the sole proximate cause instruction and asked, was the sole proximate cause of Jill Boyer's death the conduct of someone other than Dr. Eugene Legal? Again, the trial court found that it was inappropriate to do that because, you mentioned the post-trial motion, because, in fact, John, as well as the entire family, were actually plaintiffs in the case because of the wrongful death. So because they were plaintiffs in the case, it says that you can't have the special interrogatory when it would include the plaintiffs in the case. And the wording was such that it would include, in fact, the argument that was made by the defendant at closing. The defense argument at closing was clearly, it was all John's fault. Clearly, that was the argument. Did they ever argue, in the record, is there anywhere where they argue that it was some of the pre-treating doctors? They certainly made that argument before the court, but before the jury, they didn't. At least not in closing arguments. They mentioned about the earlier treaters. They discussed it. But they began at closing arguments. During the trial? During the trial, they mentioned that she was being treated for depression. And the argument was that she was depressed, which is why she committed an overdose. She overdosed on Tylenol. She committed suicide. But there was never any evidence presented to the courts that the conduct of one of the earlier treaters, or all of the treaters combined, was the sole cause of Jill's death. And it couldn't be. The kind of defense theory we seek is that Jill committed suicide. Therefore, regardless of what anyone else did, there is no death unless Jill acted and committed suicide. Unless Jill's actions contributed to her injury. And indeed, the jury was instructed on contributory negligence with respect to Jill, and their verdict form, as convoluted as it is, did find that Jill's contributory negligence was 50% of the cause of her death. So the theory considers, that is the entire theory of the case, under no factual scenario can it be possible that the conduct of other non-parties, including prior treaters, be the sole possible cause of Jill's death by suicide. It's a puzzle. Jill's conduct has to contribute to the injury. She has to. And this was a week ago. Defense thought we needed to cite the original authority of Douglas v. Ellington Park. This court granted that lead. And in Douglas, they cited it to refute playing a citation to this court's earlier ruling in Abruzzo v. Park Ridge, from the proposition that a sole proximate cause of destruction is not proper when there is more than one cause of the injury. If there's concurrent causes, you don't renounce out to a sole proximate cause. And next, what we argue in our brief is that because Jill's overdose of Tylenol wouldn't have contributed to the cause of her death, the conduct of non-party doctors could not, by definition, be the sole proximate cause of Jill's death. Did then the trial court correct that error by vacating the special inventory? It in part corrected the error. Absolutely vacated it. But it didn't go far enough because it also should have ended with a new trial because the improper special inventory continues to mislead the jury, which is clearly a problem being the verdict itself. But the trial court on that issue interceded for Jack. She, right, she did. So, therefore, that issue was corrected in the trial court. Respectfully, no, because the relief that was sought in the post-trial motion was a new trial. That because of all these issues and these obstructions and special inventories that shouldn't have been in the case regarding John and the family's contributory negligence, it confused the jury and misled the jury. And that's clear from the verdict itself. How is it clear? The verdict offered, the jury verdict found that Dr. Leibov was responsible. It found against Dr. Leibov. On the verdict? On the verdict 1B. On verdict 1B, it found that Dr. Leibov was responsible. It also found that Jill's negligence was 50% of the cause of her death. So we have 50-50 is what we have there. And then we have this special article in which the trial court admitted she'd never been guilty, says that someone other than Dr. Leibov was 100% responsible. That can't be recognized. I mean, after that, is it further proof that there was confusion among the jury? You have. This is the old verdict. The jury was instructed, there's something wrong about that, that there was a presumption of pecuniary loss. If you find for the plaintiff there's a presumption of pecuniary loss, now that presumption can be rebutted, but there's a presumption. There was no evidence in this case, it's true about the presumption, there was no evidence in this case that there was any estrangement by Jill and her husband and by her children. In fact, all the evidence showed that they all had a close, loving relationship. She lived with them. She had a close relationship. Just that morning that she committed suicide, there was testimony that she comforted her youngest son, Johnny, who was upset because something happened in the basement where he was living, and it flooded the night before, so they were up late trying to fix the flood, and she comforted him, saying it's going to be okay. He chugged her the day that she overdosed. He chugged her, and she comforted him. There was no evidence that there was an estrangement to the testimony of zero verdict. So the conclusion... We didn't even appeal the zero verdict. We did not appeal or argue that the zero verdict itself was beyond the manifest way of the evidence. Right. We did not do that, because it's all exactly what we argued, is that it was evidence of the prejudice which arises out of the improper jury instructions and the argument relating to the contradiction. I'm not sure I see the connection between the prejudice and the zero. The courts have held, the Supreme Court in the Freeman case and other courts, have indicated that if you give an improper jury, an improper special interrogatory, it shouldn't be given, then the proper lead is to give a new trial, because there is confusion or misleading among the jurors. To see the jurors confused, I have to look at the verdict, which cannot be reconciled. There is no explanation for a verdict of zero damages, of 50% responsibility of Jill, 50% responsibility of Dr. Weta, and sole author cause of someone else. It's all evidence of the confusion, and it shows why the jury was confused. So, are you arguing both that the special interrogatory and the verdict were inconsistent, irreconcilable, and are you also arguing that the jury was confused? Essentially, we're arguing that the jury was confused because of the logical inconsistency. There's also a separate legal doctrine of the legal inconsistency. So, I guess I'm going to sort of leap over, but I understand technically there's separate doctrines, and all of that, in the way you argue, shows how it's logically inconsistent. And for the same reasons, it's also legally inconsistent. There's no—you can't reconcile. The defense has never reconciled the verdict. I realize that we're not necessarily bound by the Deggars v. Owens case, which is another division of this court. They were defending it. Oh, right. And if I can go back to that. Yeah, and I think everyone—I think, excuse me, the plaintiff's bar, the defendant's bar as well— that that case, in that opinion, is going to stand. There still hasn't been a motion to reconsider. It's probably going to be up to the appellate court, because of the rigorous defense. And I'm going to go back to that, if I may. It doesn't matter. It doesn't apply here. The Douglas Court made clear—well, what they found is that it effectively overruled the Abruzzo case, and also another case by this district, the Clayton case, by saying that a conduct with two or more nonpartisans could be the sole proximate cause. And it doesn't matter if it's just one nonpartisan. But the Douglas Court made clear that the sole proximate cause instruction required evidence that 100% of the blame fell on nonpartisans. And that's in paragraph 37 of this decision. The Douglas Court found that whether it's the conduct of one nonparty or ten nonpartisans, it does not matter. That the sole proximate cause instruction and special auditory are appropriate where there is evidence pointing to the conduct of multiple nonpartisans comprising 100% of the cause of plaintiff's injuries. And that's paragraph 6. Douglas does not hold that the jury should consider the plaintiff's contributory negligence along with the negligence of nonpartisans in determining sole proximate cause. That's not the holding of Douglas. But in any event, here, there are no nonpartisans. That's your position is there are no nonpartisans that were at issue because they didn't argue that. They only argued suicide and they argued the husband. So in any event, that case is in the applicable situation. I assume that's your... Absolutely. If you want, we can spend the time and we can go through the analysis of the case. The Douglas case was last talked about. Two Supreme Court cases. The Nolan case and the Reedy case. And I'm not going to get into the most recent one. I don't see what relevance there is. Right. But we don't need to go there. Because defendant's theory of the case under any actual scenario requires Jill to be contributory negligence in committing suicide, in doing the overdose. The sole proximate cause was not either done with because there is no evidence that the conduct of these other treaters, either individually or together, were 100% the cause of her death. It can't be. Because Jill's conduct is at issue in this case. At best, under defendant's theory of the case, the treaters contributed to Jill's death. But they weren't the sole proximate cause. Because their conduct still required Jill to be contributory negligence and to commit suicide and take an overdose. And to talk about the brief. In addition to airing and giving the sole proximate cause and allowing, and the instruction is special and laudatory, the trial court, for the same reasons, aired and allowed the argument that John and the family were the sole proximate cause of her injury, of Jill's death, because they didn't call 911 sooner. Because they did not have an affirmative defense on this issue, John and the family's conduct as parties to the case, aren't at issue in these types of cases. But you didn't object to the question. We didn't object because there's no point. The court had already found that the argument was going to be allowed because it found that the special, the juror's instruction, the sole proximate cause juror's instruction, and the special and laudatory were properly allowed. And so we did object to that. And there's nothing else we need to preserve. Right. If a motion is eliminated, to preserve that, you get an objective trial. If a motion is eliminated, denied, you still have to object. Right. But here, we're beyond that. Because we're talking during discussion and comments, right before closing arguments. We're not talking about the admission of certain evidence and then objecting to that. We're talking about the, we objected and said that there cannot, that the special and laudatory and sole proximate cause are improper because the conduct of John and his family cannot be a sole proximate cause. You can't consider it. And the judge said, no, I'm going to instruct it and allow an argument. That's all receptivity we have to do. We don't have to. The judge found that she was wrong in doing that. Anyway, the judge found. The argument is that once the jury heard it, saw it, you can't unring that bell. Certainly, especially when the closing argument began by saying, if John started, if John would have called 911 sooner, there's a 95% chance that Jill would be alive. That's the entire thing. And that was all improper. The trial folks in giving the improper jury instruction special and laudatory, combined with the argument that flowed from that, unfairly prejudiced the plaintiff. And the new trial is proper, where improper evidence of argument appears to have affected the outcome of the trial. And, indeed, we find a series of cases where the purpose of having those special and laudatories are vacated. A new trial is appropriate because contradictory conclusions indicate that the jury misunderstood the issues. Again, the trial court found that a new trial was not required because, based upon the general verdict, setting aside the special and laudatory, based on the general verdict, it appears that the time at the doctor level was considered separate and distinct from the still proximate cause because they found 50% liability or 50% responsibility of the doctor, 50% responsibility of Jill, and there were zero damages. But it can't be drawn from the general verdict for what we've already talked about with respect to, in part, the fact that there were zero damages. There was evidence that there was no injury by defunction, that there's been a pecuniary loss. The only explanation for the verdict is that the jury was confused by these improper constructions, but the court found they were improper. How do you think the jury was confused? I mean, what is the nature of that confusion? The fact that it was down at zero, how does that show confusion? It shows confusion because there's no basis for that. There's no logical basis for it. They could find she was at fault. Sometimes people don't get damages. And they did find her at fault. They found Jill 50% at fault. But that meant that they also found Dr. Lightman 50% at fault. And they were instructed that if you find them at fault, then you award damages and that there was a rebuttable presumption that there was a pecuniary loss. We've had a fourth district case in the brief. I apologize. I can't think of the name off the top of my head, which addressed that. When it comes to jury finding that the rebuttable presumption was rebutted, that the state didn't do any damages? With one evidence. I don't understand. The evidence of when... An example is the detached case, the defense case in the response brief in which the jury found awarded $50,000 for wrongful death damages. And there's a plaintiff appeal saying, you know what, you should have been hired. And the court said no. The evidence was that the decedent was actually estranged from his wife and his kids. But the kids hadn't seen him for two years and that he wasn't living with his wife and she never went to see him. And so there was evidence to rebut the presumption that a $50,000 verdict was proper. So what you're saying is here there was evidence to find for damages, and if they didn't do any damages, then they didn't understand what they were doing as a result of the interrogatory. We can't parse it out like that because it all happened together to the jury. It's not that the jury said, okay, we're going to address this issue and then we're going to ignore everything we just talked about and address this issue in the verdict form and then ignore everything we talked about and then address the special neurotoxin. That's not the way it works. They were told all this information, which was the judge admitted was wrong. They were given a special neurotoxin, told to answer a question, the judge admitted this is wrong. They come up with a verdict which can't be explained by the evidence. That all is evidence that they misunderstood and they were confused, and that's certainly consistent with what the Supreme Court sentence put him in and the other cases we cite from the appellate courts, which indicates that when a special interrogatory is improperly given, the father remedies the new trial because you confuse the jury by putting issues before the jury, making them make specific decisions that they shouldn't have to have done. Let's briefly turn to the second issue, which was the proximate cause and what we'll call the evidence gap. That's what it is. The trial court granted J&OB in March 2017 based on a perceived evidence gap on proximate cause, and that was a noted review by the court. But when you view the evidence in the light most favorable for the plaintiff, as you're required to do, there was sufficient evidence that the doctor's negligence was a proximate cause of plaintiff's overdose. Dr. Rickheimer, who is a plaintiff's expert, who is a pain medicine doctor, who ran a pain medicine clinic at the University of Southern California for the last 15 years,  he's managed to care for patients on opioids, and he works with psychologists, psychiatrists, therapists, and others in a lot of multi-disciplinary approaches in the treatment of patients on opioids. He testified that the standard of care was breached by failing to recognize Jill's addiction to opioids and to refer to treatment for addiction, and also to continue to recognize Jill's addiction to opioids and to refer to treatment for addiction. That's referring her to an addiction center for detox. And then also continuing to prescribe and escalate the doses of opioids even after she has to be taken off of them. He also testified that what should have been done is either the doctor should have weaned Jill off the opioids himself or send her to a detox program and get her addiction treatment. So it was two things that he should have done. The first part of that would have been recognizing that she probably had an opioid addiction. And he's a pain medicine specialist who deals with opioids all the time, and he keeps prescribing Diludad, which is the strongest stuff you can get, overlapping it with other things. And his contribution was 10 days before her overdose, where Jill saw it and said, I was just in the hospital, and I don't even know why. I wanted to be taken off these opioids. And so he gave her a lower dose. Seven days later, three days before the overdose, she came back. Even though she reported that her pain was actually better on the side of medication with the lower dose, he gave her 420 pills of Morphine, which is the higher dose. He gave her 420 pills. Each pill contains 325 milligrams of acetaminophen, which is the equivalent of one Tylenol. He gave her 420 pills when she just asked that I had a problem and I wanted to be taken off of this. And she overdosed three days later. In other words, you appeal to be successful. Am I correct that you have to be successful on this claim? That is. So unless we find that the judgment notwithstanding the verdict was incorrect, we don't have to reach the other argument that you just made. Right. For the plaintiff to prevail, we have to get a yes answer to some of the issues that I suggested. We have to find that one who was entitled. We have to prevail on both. We have to have the finding that a new trial was proper because of the confusion with the sole proximate cause issue, and that also the trial prepared in granting the JNLV based upon proximate cause. Now, the doctor expert, Dr. Rick Meyer, said that as a pain management specialist, which he is, he would have tried to wean her from these addictive drugs or send her to a detox center and an addiction office. Correct? Yes. So he would, one or the other, and he had to do both. No, no. He said something like that. The defendant either had to wean her off herself or send her to an addiction center and to an addiction office. He testified that he sent patients to an addiction office. Correct. See, this is important. I'll show you a picture of a patient. It sounds like we might be on different pages. He said, I can wean her off or you send her to detox. Right? Those are similar types of contract. And then he said, and, and in the training he said, and to an addiction office so that it's A or B and C. It's A and C or B and C. That is, he is saying that he's not a test random psychiatrist. He's not a addictionologist. Therefore, in her situation, no matter whether he weans her or she goes to detox, she needs a addictionologist. Respectfully, I disagree, and I'll cite to page 397 of the report of proceedings where he testified that the defendant needed to react to that. He's referring to the red flags of addiction. By weaning her off the drugs or sending her to a detox program and getting her addiction treatment. So it's either weaning her off herself or detox where an addictionologist is the one who handles it. Okay. So that's the either or. Right. It's not three things. It's two things. Right. And, you know, that's part of the parking lot. And he also testified that had Jill been off the opioids, the suicide, the death, the overdose would not have occurred. And he explained that, in his opinion, the overdose was an accident. It's not intentional because she was heavy from all of the medications that she was on, and this is all sufficient to show, I apologize, I don't have time. No, that's okay. I have a question. Going back, you just said that they're mutually exclusive. That is, send her to detox and addictionologist or he weans her. Now, what I don't understand is how if he weans her, she could still have an addiction. I mean, the fact is that he reduced the amount of drugs, you know, 10 days before and then doubled it up or whatever later. But he's not an addiction person. And just because he weans somebody, I thought the testimony said that, yeah, you can wean her, but that doesn't solve the addiction problem. He's not saying that I can, I'm not an addiction person, he's saying. So even if he weans you, that doesn't solve the addiction problem. She could be taking less because she's using less. Now, I'll take away all the drugs, and I'm just going to give you a few pills. She's still addicted. I mean, when somebody's addicted, we know she's addicted, right? I mean, you're not contesting of the addiction, right? Yes. Yes, I'm correct. Yes, yes, you're correct. I'm not disputing. I'm not disputing. You know, it doesn't take, I mean, what the doctor is saying is, okay, I can't treat the addiction. That's not my, my thing is not the addiction, it's the pain. And the pain, I want to wean her down, but that doesn't solve the addiction. And you seem to say, well, those are separate. I guess we can argue both of those. I'm sure the other side may actually be a little different. But I just wanted to put that out there. Okay. And I appreciate that. For this JMOB, you look at all the evidence that was presented to the jury in the light most favorable to the plaintiff. And what the jury was told is that Jill wanted to be off these medications. You have the expert saying that she should have been put off the medications. He said the two ways that she should have been taken off the medications. There's two ways to do it. And that the failure to do that resulted in her death. So, but five days before she died, he gave her 30 days' worth of Narcol. Three days before. Oh, five days before she died, yes. Three days before the overdose. Two hundred and forty pills. Three days before the overdose. So, five days before she died. No, two hundred and forty pills in her purse. Yes. Plus NADX. Yes. No wonder she was confused. Yes. Yes. Yes, that supports that presented evidence that it was an accident. But your argument here is that there were two causes of death. The doctor could either refer her to an addictionologist or wean her off of the pain medication. And if he weans her off of the pain medication, there's no need to refer her to an addictionologist. Is that the argument? Correct. There were two causes of treatment that could have been done. And either one of them would have, in our expert's opinion, saved her life. And so, the breach of the standard of care, your argument is that he did not wean her off of the pain meds. And therefore, that's the cause of her death. The breach of the standard of care is that she was not properly treated for her addiction. And what should have been done is wean her off himself or refer her to detox. And he didn't do either. And he didn't do either. Right. So, the breach of the standard of care was not acknowledging or treating the addiction. So, in that case, doesn't the trial court need to hear from an addictionologist to connect to that? Respectfully, no. Then, we cite cases that are a technical argument in your opening brief. Talking about that level of detail isn't required. All that matters is that in the St. Joseph case in 2018, I believe, Justice, you concurred on this one. All that matters is there has to be evidence of, of course, the treatment. There has to be evidence of what the treatment would be. But there's no requirement to be additional specifics. You don't have an addictionologist come up and say, here's what I would do. I would put on this medication. I would do this, this, this, this. That level of specificity isn't required. And it doesn't matter with respect to the wean-off anyway. But with respect to the addictionologist, it's not a fact. When you look at the – and I apologize. I apologize for running out of time. It just won't go away. But really, really briefly, if you look at the Adherence case, which is the case that the trial court relied upon for the evidence gap, you have a situation where it was favored for the time they do a CT scan. The famous theory was that if you had done that, that would have been surgical intervention. On cross-examination, the defense asked them, okay, what happens? And they said, well, you know what? I'm not the one who makes the determination about whether or not there is surgical intervention. I refer to a neurosurgeon, and I don't know what they would do. I have no idea. The defense presented evidence of neurosurgeons saying she was not a surgical candidate. So there's where the evidence gap is that there's no evidence of a course of treatment. That's not what we have here. We have evidence of two potential courses of treatment. Well, we have more than that. We have evidence of him continuing to give her high doses of opioids. When she's saying no. Right up until five days before she died when she said she didn't want any more. When she's saying no. Absolutely. Absolutely. So I'm trying to keep it short, to be honest. If you have any other questions, I'm happy. So your position is that simply weaning somebody off an addictive drug, you don't need to go to a dictionologist? No. That was the evidence that was presented to the jury is that weaning her off is an option. And you add that to Jill saying that she wanted to be off the drugs. The jury would conclude from that that if you had done the proper course of conduct and weaned her off, there's certainly a question of fact whether she would have actually stopped taking the drugs. It's a question of fact. It would also be a question of fact if halfway through this weaning process it wasn't working and some other decision was made at that point. We don't know. Right. We have no way of knowing because she never tried to reduce her dosage or reduce the kind of medicine that she was taking, the strength of the medicine. Right. In fact, he increased the dose even though she was reporting success on the newer medication that she was on. Right. A month before she died he gave her the 8-milligram dilaudid. And then he switched her to the Vicoprofen 10 days before, which is a lower dilaudid than Norco than Vicoprofen. So he changed her to Vicoprofen. In fact, a week later she says that her pain is getting better. She's no longer a cyst. She's a thigh. And he inscrutably gives her 412 pills of Norco. Right. So thank you very much. Thank you. Next we have Ms. Tresher. May it please the Court. Plaintiff utilized one expert during the course of this trial, Dr. Richheimer. And this is what Dr. Richheimer said. Dr. Richheimer testified that Jill Gehr was addicted to opioid medications, that Jill Gehr's death resulted from her addiction, and then he said, I don't treat addiction. That was Plaintiff's only expert witness. She was addicted. She died secondary to her addiction, and I don't treat addiction. According to Richheimer, if a patient has an addiction, they need to be referred to a specialist, a psychiatrist, someone who knows how to cure them of the addiction. We just heard it. I just want to make sure. You're arguing, I said there's A, which is bleeding. There's B, sender detox, and C, the addictionologist. One way to interpret this is that he testified you need A and C or B and C. I think that's what you're saying. What I'm saying is as soon as their only expert says she's addicted, she died secondary to the addiction, and I don't treat addiction, there's a gap in the proof, because it doesn't matter if you wean her off of her opioids that she's addicted. Right, but that's what you're saying. He testified that weaning her off is an option separate and apart from going to an addiction. If he as a pain specialist could simply wean her off, and that's sufficient. That's what he testified, page 397, I think he said. The record also shows that Dr. Lipoff never did refer her either to a psychologist or an addictionologist. That's correct. Never referred her. That's correct. And we don't know what an addictionologist or a psychiatrist would have done with the patient. Would he have diagnosed an addiction? Would he have agreed that she could be weaned? We don't know that. And to suggest that she could be weaned, we know while the expert says that she is addicted to opioid medications, she's addicted. So now we're going to take a patient who suffered several years of disabling, chronic, debilitating pain, who's two months post a major spine surgery, but all the doctors agree she has to be maintained on pain medications for at least three months. She's depressed. She has a mental illness. She's being treated for a mental illness. She has an addiction. Wait. That addiction is what needs to be addressed. Wait, wait. A couple days after her surgery, she said her pain was 5 out of 10. Not 10 out of 10, not 10 out of 10. It's 8 out of 10. And it's 5 out of 10. 5 out of 10. 5 out of 10. And so it's hovering somewhere between 4 and 5 out of 10. And the doctor that she's relying on for her pain doesn't realize that she's addicted or realizing that she's addicted doesn't wean her or refer her to a psychologist or an addictionologist. So what are we supposed to make of that? Well, he had weaned her to that point. And, you know, we're not going to say he weaned her. Well, he did on July 18th. Well, that's not weaned. She definitely went up a few days before. And Dr. Lysol addressed that in his testimony. He said she came in and she asked the different type of medication. This is a woman who had been on all different types of pain medication for years. She knew what helped her. She knew what her body responded to. She came in on that day and said, I think that I need this. I think that this will work for the discomfort that I'm having. That doesn't, you know, that's what the patient asked for. And I will go back to what we're talking about here is plaintiff's burden of proof. And we're not here to retry the facts of this case. We're here to analyze whether what happened at trial, whether that expert carried the ball across the field to establish a link between the deviation and the injury. She's addicted. She died of her addiction. I don't treat addiction. I think the surface court was right. The plaintiff failed in that burden. And the jury agreed. The jury answered the special interrogatory saying, the full proximate cause of her death was something other than the conduct of Dr. Leifoff. Why is that relevant? It's not relevant now. Well, it is relevant. It's consistent with the court's findings. The jury answered that exculpatory special interrogatory, that the conduct of someone other than Dr. Leifoff was the cause of this death. Well, but the verdict was 50% the doctor. So they're internally inconsistent. How does that work? I don't agree with that fundamentally, Justice Paczynski. All we know, the general verdict, we can't explain. We will never know why the jury signed Verdict Form B. We know why they signed Verdict Form A. And maybe the plaintiff is entitled to a new trial. And it might be that the jury determined that Jill Geer committed suicide because her mental illness wasn't treated by her primary care physician, because Dr. Selzman didn't wean her from her medications, because Dr. Tomlin said she's not at risk for an addiction. She's not at risk for misuse of medications. And Jill's conduct in combination with one of those treating physicians could have been the sole proximate cause. And I have to take issue with counsel's statement that the defense attorney never argued that in closing. He definitely argued that in closing. He pointed out that the primary care physician was treating her mental illness, medicating her for her depression, that Dr. Leipoff, according to Richheimer, did not have a duty to treat her mental illness or to diagnose her as suicidal. He also argued that Dr. Selzman's conduct in failing to wean her from medications long before Dr. Leipoff saw the patient may have caused her death. So we talked about it before trial started, that Dr. Sultanian or other treating physicians could be the sole proximate cause of this death. We discussed it in closing argument. And I will get to the testament. I will give you the citations to the argument where we did that. That's why I think this case is like Townsend and Aguilera. The condition that Jill Guerra had, no doctor who treats that condition testified in this case, just like in Townsend and Aguilera. In the cases that plaintiff relies on, in each of those cases, the type of physician who treated the patient's condition testified and established what the diagnosis would have been, what the treatment would have been, and how the treatment would have made a difference. In Vanderhoof, there was a surgeon who testified about the surgical technique that should have been utilized. In Golina, a hematologist testified and said, if these blood products had been given to the patient in the time we married, this is how I could have treated this patient. In Moeller, an oncologist testified and said, I treat cancer. I can tell you how I would have treated this patient's cancer and that it would have made a difference. Plaintiff didn't have that testimony here. The key testimony, and I don't have the page where the testimony is, but I have the page where the judge quotes it. And the judge stated that the plaintiff, in support of meeting his burden of proof regarding fractional cause, cites the following testimony of Dr. Rick Heimer. And then she says, quote, if he, meaning Dr. Ripoff, if Dr. Ripoff had referred the patient for treatment for addiction and they had gotten off of these medications, then I don't think you would be here today because I think she'd still be alive. So that statement itself is really what you're relying on and what the court relied on to say the addiction is the whole ballgame here and without that testimony we don't have the missing link. Right, precisely. And if she had gone to a specialist, if she had gone to a psychiatrist, and there's no guarantee of that. We know that from the record. And if the psychiatrist had diagnosed an addiction and if he could have weaned her off of medication, there's the problem. Those are all hypotheticals. And Dr. Rick Heimer wasn't able to carry the ball across all of those hypotheticals. Well, excuse me, counsel. Some things are not hypothetical. From September 16, 2010 to the day that she died, which was July 26, 2012, the only doctor that she was seeing for pain was Dr. Lippoff. She saw another doctor for surgery. Dr. Lippoff performed two radiofrequency procedures. He gave her some injections. The first day that she saw him, he didn't start with dilutin, but he also didn't start with bicloprofen, which is the weakest of the three of them. He started right away with Norco. Then he tries that with diluted. Then he tries that for a while. Then he increases the dose. Then he decreases the dose. Then he increases it again. Then he starts on Norco again. How is it possible that this doctor, who keeps giving her Norco, 240 pills of Norco five days before she died, and she keeps coming in saying her pain is somewhere between 4, 5, and 6 out of 10, which may or may not justify diluted to begin with and may or may not justify Norco to begin with. Isn't he responsible for recognizing that she has an addiction and he needs to make referral, which he never did? Isn't that really all we need to know? He gives her these high-degree opioids, and he never, ever made referral to somebody else to evaluate her. That doesn't carry the ball the full way. Why? Here's the other thing I'd say. We're talking about what he did. He did not. No, I know. But then no one established, okay, that if he had gotten her to a psychiatrist, what would the psychiatrist have done? Why do we have to know that? Because that's part of the proximate causation necessary link between the deviation and the injury. And maybe the proximate cause is that he didn't refer her. Respectfully, the court can't sit here and act as a physician or an expert and determine whether what he gave her was proper and on this day was this increase in medication and on that day was the decrease in medication. That's not what we're here to decide. We're not here to decide whether on any given date he prescribed the appropriate amount of medication. What we're talking about is did this plaintiff, who has the burden in a medical negligence case, of establishing through expert testimony to a reasonable degree of medical certainty that this addicted patient who died from her addiction, that the cause of her death was secondary to that addiction, something that his expert doesn't treat, couldn't say, once the psychiatrist saw this lady, what would he have done? What would she have agreed to? What could she have tolerated? Maybe a psychiatrist would have said, I couldn't wean her from her medication. You've referred this woman to me. She's had chronic debilitating pain and she's depressed. She's been hospitalized for treatment of depression. We don't know what that psychiatrist, what that specialist would have done with this patient. It's his burden to prove that, and he did. Well, he did prove that this doctor prescribed Xanax. Xanax is an antidepressant, isn't it? I don't remember any indication that Dr. Richland prescribed Xanax. 7-21-11 prescribed Xanax. 7-14 prescribed Xanax. And Xanax is also a medication that can be utilized in treating pain. Well, counsel, I'm still wrestling with, you're seeing one doctor for pain. She's at the point where she's not seeing a bunch of doctors anymore, which she was during the beginning. Now she's only seeing one doctor. And he continues to prescribe Dilaudid, which is, call it the strongest of the three of these, because it's got the most morphine in it. And it's five to seven times stronger than morphine. Morphine they give you after surgery in the hospital in a drip. She's taking it in a pill five to seven times stronger than that in her house. And he keeps giving her that. Then he starts giving her Norco. And my problem with all this is that the expert testified, to a reasonable degree of medical certainty, that he should have referred her. He didn't. Right. And we don't know what that doctor would have done if he had referred. I'm going to need to really think about why I need to know that, because the fact is that's where the buck stops. He didn't refer her. He could have. He shouldn't have. But it's hard to claim it's a burden of proof. If you're saying there's a deviation, you have to prove how that deviation caused the injury. And if your deviation is the failure to refer, then you have to show what would have happened with that referral. That's exactly what Townsend and Aguilera stand for. You can't just get to a certain point and say, I'm done. I've established that he should have referred her. You have to carry the ball to the end zone. You have to say the failure to do that resulted in a psychiatrist not seeing her. A psychiatrist would have diagnosed this. A psychiatrist would have prescribed this. A psychiatrist would have accomplished this. That would have prevented her death by suicide. And how would seeing an addiction specialist or psychiatrist, how would that have prevented this depressed woman with chronic back pain from committing suicide from an overdose of acetaminophen? None of that. None of that was heard by the jury. Claimants have a burden of establishing that. You can't just say, you should have done that and not prove that it made a difference. And that's where they fall down. Could you talk about why they're not entitled to a new trial? Yes. Before I get to that, if I can briefly, and you're right, Justice Hyman, if you decide that the plaintiff didn't carry the ball on proximate cause, the appeal is resolved. Because then judgment should have been entered in favor of the defendants. The jury never should have gotten this case and all the others. It's the one thing you two might agree on. Yes. The other claims of error are then moved. Also, I have to take issue with any argument about damages in this court. The jury returned an award of zero damages on verdict form B. The plaintiff never contested that award of damages in his two post-trial motions. He never said that that award was against the manifest way of the evidence. He never claimed any error. He never said that the court improperly limited his damage evidence. He never asked for a new trial on damages. Under 1202, under Supreme Court Rule 366, an abundance of case law, that's forfeited. Any claim that that damage award was improper is forfeited. You can't stand silently in the trial court and then come up here and say, and by the way, now I want a new trial on damages. We know that. In addition to that, that award was not against the manifest way, and that's the standard. There was a lot of testimony in this case that Jill suffered from debilitating pain. She'd been suffering from it for years, that she was depressed. She had been hospitalized for depression. The jury may have determined that she committed suicide. The jury may have determined this was her life expectancy. This is 50 percent, so if that's what they determined, then they would have said 100 percent. Not necessarily. I think they may have said to themselves, and again, we can never know why they did what they did on verdict form B. But they may have said to themselves, well, her primary care physician didn't treat her depression properly. Or Dr. Tenwin was wrong. She was suicidal. No, but they said that she was 50 percent responsible, and lip-off was 50 percent responsible. Not some other doctor, but she said lip-off. No, she didn't. I mean, actually, the jury. No, they didn't, because they answered the special auditory. Well, take the special auditory to the side. Okay. And they ruled in favor of the plaintiff on the verdict. On verdict form B. And said 50 percent responsible. And zero damages. Zero damages. Which was never contested. And my point is, that award was not against the manifest way. It's a rebuttable presumption. But he didn't raise that, so. He didn't raise it. He didn't raise it. And it's a rebuttable presumption. And this is uniquely a jury determination. This is what we look to the collective judgment of the jury to say, all right, do you believe that this family suffered any damages? And the intent of the jury here was clear. Zero, all the way across the board, on verdict form B. That's a question of fact. But the jury was simply confused. And when you combine all of the errors in the trial, first the omitted error of the special interrogatory, the error in allowing the evidence of John's failure or delay in calling 911, the comments made during closing arguments, isn't the plaintiff entitled to a fair trial? Does that not prejudice the plaintiff's right to a fair trial? All of these are combined errors. And we had a comedy there, too. So how does this work? And I would, again, address the point that plaintiff has never asked for a new trial on damages in the trial court. Didn't ask for it. Didn't claim that the damages were prejudiced, as you asked, Justice Hyman. And he never said that the award of damages was prejudiced by the special interrogatory. Never made that argument. He asked for a new trial on our relations. Yeah. You know, our statutes and our rules and our case laws say you have to specify the relief you're requesting. And there was never an allegation that there was any error with regard to the damage calculation. Never. And never a request for a new trial on damages. That's forfeited under the statutes, under the rules, and under the case law. Then, let me address the full proximate cause instruction and the special interrogatory. They were warranted by the evidence. I think the circuit court was right the first time and wrong the second time. The special interrogatory and the full proximate cause instruction were warranted by the evidence. Why do I say that? Under Leonardi, if there is some evidence that the conduct of someone other than the defendant is the full proximate cause, the defendant is entitled to those instructions. Okay? The evidence can be slight. Leonardi says the evidence can be slight. The defendant doesn't have to prove anybody else's negligence. We know that from the case law. So what was the evidence here that warranted those two instructions? Dr. Richheimer said Jill was addicted to opioids since early 2009. Dr. Feldman was treating her during that interval. Jill should have been weaned off of her opioids during those two years. There was evidence with respect to Dr. Feldman. Dr. Tumlin, psychologist, he concluded there was no evidence that Jill was at risk for misuse of her medication.  He said this patient doesn't need to have follow-up with a psychiatrist or a psychologist. Turns out he was wrong. Right? All of that evidence came in, and the jury's finding of the special interrogatory could have been based on Dr. Tumlin's conduct. That was evidence of conduct of someone other than a party that may have been the sole cause of her death. Dr. Sultanian. The trial judge said that, and she said these are the only words they found with regard to sole proximate cause, that in the closing argument, you said that the site, this is her word. If you decide sole proximate cause of injury to the plaintiff was a conduct of some person other than the defendant, then your verdict should be for the defendant. We know that if this patient got to the hospital within 8 to 10 hours from the time of her overdose, she would be alive today. She would have gotten the anesthetics, the antidote. Yeah. And then it says, if they called 911 at 11 o'clock, anyone, John, Katie, Jackie, Johnny, they see their mom unresponsive, call 911, we wouldn't be here. She would get the antidote. Antidote, basically, right. She would be cured. If you find that they're failing to recall the sole proximate cause, what she's saying, however, is the only thing raised were the family members. That's what she, the judge, said. She was wrong, and so were plaintiff's counsel. And I'll point you to the argument. In defendant's closing argument, he said Jill died secondary to a mental illness, 1356. Dr. Saltanian was treating her for that mental illness, 1378 and 1387. Leipov was not treating her psychiatric problems, 1382, 1387. Jill's suicide resulted from psychiatric issues managed by other doctors, 1405. And Dr. Feldman had increased her dosages when she was allegedly addicted to opioids. Those statements covered Feldman, Tomlin, and Saltanian. He didn't use the magic words during his closing argument, sole proximate cause, but he didn't have to. What he told the jury was that this woman had a mental illness that was being treated by her primary care physician. Dr. Wittheimer admitted that Dr. Leipov wasn't responsible for treating her depression or her mental illness. The jury could have found, based on that evidence, that the sole proximate cause of her death was the conduct of one of those physicians. She hadn't seen, at least the record doesn't indicate that she saw any other doctors after September 16th of 2010. No, she did. Dr. Saltanian was still her primary care physician in 2011 and still treating her for depression. He was the doctor who was prescribing her antidepressants, and he continued to see her through 2011, and that's at page 420 of the report of proceedings. So, the judge was right the first time. The sole proximate cause instruction was warranted, and there was discussion about the fact that it was going to be requested for Dr. Saltanian's conduct before trial started. During the motion eliminate conference, there was a discussion about, are you going to say that John was the sole proximate cause? Yes, and I'm also going to suggest that Dr. Saltanian was the sole proximate cause. So, that was a theme for the defense from the beginning of this trial through until the end. Plaintiff says it was inappropriate to give it for John Garrett's conduct, those instructions. But plaintiff can't prove that the jury signed that special interrogatory for the conduct of John Garrett. They had evidence of these three other treating physicians. The instruction was warranted for the conduct of those three physicians. Unless John Garrett can establish that the jury signed that special interrogatory because of John Garrett's conduct, he can't prove prejudice. But he can't possibly do that. But the fact is, though, the argument, thinking about everything you said, still a major argument. What you were doing is taking a sentence here from this page to this page to this page. That's what you just did. But when you listen to arguments, it's really what's the emphasis? The emphasis was what I had read that the judge put the hook on. And that is a failure. And that's what comes through when you read the whole. In the whole. But you have to take account of the whole. The whole, the emphasis is different than you try to paint, which is here and here and here. But then there's this big statement here that says dammit. And we know that's wrong. Yeah. Okay. And that he could show. That's what the judge said. I shouldn't have. The wording was not right. It was not right wording. Well, and plaintiff had the opportunity to object to the form of that special interrogatory. Once the judge said I'm giving it, plaintiff could have said, well, wait a minute. If you're going to give it, then you need to put in there who they're talking about. Because if they're talking about John, that's a problem. Plaintiff didn't do that. So now we have an exculpatory answer to the special interrogatory. Was the sole proximate cause of Jill Geer's theft the conduct of someone other than the defendant? Yes. And we have no way of knowing whether they signed that special interrogatory for the conduct of John or the three non-party treating physicians for whom that interrogatory was appropriate. We don't know that. He can't prove it. Without proving prejudice, he's not entitled to an answer. Well, we do know, though, it's incorrect. It's wrong as a matter of law to give it with regard to family members. And we do know that in closing, the emphasis was not on the individual treaters but on the family. So that we can look at. Well, you know, Your Honor, throughout the course of this trial, there was testimony elicited from every witness about the involvement of these other treaters. Agreed. There was argument and closing argument about their impact and the decisions that were made and how that might have influenced her death. And it's the jury's function. It's the jury's function to determine what weight could be given to that and what emphasis to place on it. And, again, absent something in that special interrogatory fingering John Guerra, they can't establish prejudice. There were legitimate reasons that this instruction had to be given, not could have been given. Leonardi says if the evidence warrants it, you are entitled to the instruction. And without the ability to prove they signed it for John Guerra's conduct, there's no prejudice and there's no new trial. Counsel, I think I remember from the briefs that Dr. Lipoff knew that she was in the hospital, had privileges at that hospital, but never called up her medical records from why she was in the hospital. Is that a correct statement? Yes. And I don't think that's relevant to any of the issues that the court has before it. We're treating her for pain and she's in the hospital for a couple days and she's got privileges at that hospital. We could have just pulled them up on the computer to see what's the story. Nobody said that that was a deviation. Nobody said that that led to an injury. So even if plaintiff had tried to introduce that, it would have been objectionable and irrelevant to the issues in the case. The timing of events on July 24th. Plaintiff argues in this brief that the introduction of the timing of events was improper, but we know from reading the opening statement, from the direct examination of the family members by plaintiff's counsel, that the evidence regarding timing of events was drawn in by plaintiff. When defense counsel cross-examined the family members on the issue, no objection. The objection was forfeited. And I disagree with counsel. This was discussed before trial started. The judge had made a ruling. That was an interlocutory ruling that required a timely objection during the course of these examinations. There was no objection. That issue has been forfeited. The timing of events was also relevant to the cause of death. The experts testified that if Jill Garrett was going to die secondary to an opioid overdose, as opposed to a Tylenol overdose, death would have occurred within two hours of ingestion. And we know from the events of that day that she was laying on the couch as early as 11 a.m., continued to lay on the couch unresponsive, moaning. I can say with testimony she yelled at John at some point for hours and hours and hours. She didn't die. So the timing on that date is relevant to the cause of death. If it was an opioid overdose, she would have been dead within two hours of ingestion. And nobody suggested that she took more medication later on that day. So it was relevant to the cause of death. With regard to the closing argument, Plaintiff opened the door during his closing argument to the timing of events. He never objected to the defense's closing argument, never once. That's forfeited. And it was an issue. It was an interlocutory order. It required a continuing objection. You can't sit on your hands during trials and not object to evidence that you think is improper or arguments that you think is improper and wait until you get an unfavorable result before you come into this court and ask for relief. That's forfeited. Plaintiff then argues that the inconsistencies between the answer to the special interrogatory and verdict form B warrant a new trial. But that's exactly what special interrogatories are designed to do. That's why we have them. That's why we ask the jury, please answer this specific determinative question so that we can test the general verdict. And that's what happened here. If we accept Plaintiff's argument, then any time there's an award for a million dollars but the jury finds that the full proximate cause is the conduct of someone other than the defendant, he's entitled to a new trial. But those are irreconcilable. No, that special interrogatory controls. It says even though the jury finds its general verdict form, for whatever reason we don't know, we know one thing, and that's that the jury found that the conduct of someone other than the defendant was the full proximate cause. So are they inconsistent? Yes. And you know what that means? That the special interrogatory controls. No physician testified who treats the condition that Dr. Richheimer says she suffered from that caused her death. Nobody established what the diagnosis would have been, what the treatment would have been, what difference it would have made. Plaintiff didn't prove proximate cause. We have an award of zero dollars that's never been challenged by plaintiffs, never challenged in post-trial proceedings. Not against the manifest way to the evidence, no errors at trial, on testimony that was excluded concerning damages. The full proximate cause instruction and the special interrogatory were warranted by the evidence of the conduct of those three treating physicians. I think the circuit court had it right the first time. Maybe not for the right reason, but they were entitled. The defense was entitled to that special interrogatory. The defendants asked that this court affirm the circuit court's order, entering judgment notwithstanding the verdict, and affirm the circuit court's order denying plaintiff's request for a new trial. Thank you very much. Thank you, Mr. Chairman. Counsel? Brief rebuttal, please. I will point out we've extended this oral argument on purpose because we have students in the courtroom and we wanted to make sure that you saw the full flavor of it. We've already read all the briefs, so we knew some of the material, but we wanted to make sure that you understood it. I promise I'll be brief. I'll try to be brief. I would like to address one argument which I did not address in my opening brief, which was talking about how this whole appeal is moot because we never separately appealed the zero award. And that's just not right when you look at the procedural history of the case. The jury returned the verdict on May 25th, 2016. It was time for the trial court to enter judgment in favor of the defense based upon a special derogatory. Plaintiff then filed their motion for a new trial, a request for a motion asking for a new trial in the case. The trial court ruled on this on October 3rd of 2016, stating that plaintiff's request for a new trial is denied. Also in the same order ruling on the motion for a new trial, the trial court entered the zero verdict. The plaintiff is only allowed to bring one post-trial motion, and that's what we did. And so the next step was a derogatory request to repeal the trial court's ruling denying our motion for a new trial, asking for a new trial. But we weren't able to do that in this case because the defense came up, and they filed their own post-trial motion on this zero verdict. The result of the defendant's motion was to vacate the zero judgment verdict and enter J&OB in favor of the defendant. So now there's a new verdict for the plaintiff to file a post-trial motion on, but there's nothing to appeal with respect to a zero verdict because it's not there. There was never an opportunity for us to file a second post-trial motion on the zero verdict. I don't see why you couldn't have filed it from your initials. When you asked for the new trial, why wouldn't you have brought it up at that time? The new trial, a motion for a new trial, a motion that says a new trial is granted, a request is granted, is a new trial. You can make alternative arguments. Right. And you can only get one shot, so you need to put everything in there that you want, and you didn't put it in there. And that's their argument as well. You never raised it. Because there was not a zero verdict. There was not a zero verdict in it that we were appealing. We were appealing the special auditor, the directed verdict based upon the special auditor. I understand, but it was still zero. In the verdict, there was a verdict and an interrogator. You said you were appealing the interrogator. It shouldn't have been there. That's why you deserve a new trial. What you didn't say is, well, also, even if this is wrong, so is this. And you didn't say it. What we did was that we appealed the order, the judgment order, which was a verdict in favor of the defense. So that's what we appealed. Okay. She corrected us. I mean, still it was wrong. She corrected it. It was definitely not a verdict for the defense. It was a judgment for the plaintiff. Judgment should have been entered for the plaintiff. Well, that was the ruling on our close trial motion, is where she said I erred in entering judgment for the defense. Yes, she corrected it. And instead I'm going to enter judgment on the zero verdict. But at that time, that was ruling on our motion for a new trial. So we're still, we still have a new trial. That's what we've been consistent throughout. And then once that zero verdict, once now there is a judgment on a zero verdict, the defense came along and filed their motion and had it vacated. So there's nothing, there's nothing to appeal. Once that was entered as well. Our argument all along is that the improper sole proximate trial instruction and argument and evidence and all that confused the jury. Who filed the jury? They were not instructed properly. So we're entitled to a new trial. That's our position all along. To say that somehow we waived a zero verdict, which slid in there, even though it encompassed part of our argument throughout, and then was actually vacated at the request of the defense, but somehow we didn't appeal that separately, I don't think we need to do that. We consistently ask for a new trial. Do you have any case that supports your position? I'm trying to think if I cited anything specific. I know I cited specifically addressing that you only had the one shot. And I also did cite case law which said that a new trial encompasses everything. So a new trial means a new trial for damages and liability and everything. So we do cite case law for that. And that's a well-settled proposition. And that's what respect to this falls under. Just briefly to address just a few points that were raised. On the sole proximate cause, counsel stated that she couldn't explain the general verdict. And that's great. No one can explain it. So what that shows is that the jury is confused and misunderstood. What we know is that it just sort of supports our position. Finally, on the proximate cause. The evidence showed that the defendant fails to recognize and treat the addiction to opioids. The jury also presented evidence that Jill wanted off these opioids. And there was expert testimony that she would be off the drugs if either the defendant weaned her off or sent her to an addictionologist. Plaintiff's expert did not testify that if you send her to an addictionologist, I don't know what happens. He never testified to that. He didn't say, I defer to what an addictionologist would do. That's what distinguishes this case from the Aguilera case and the Townsend case. He indicated that there were two specific forces of treatment. Looking at this proximate cause, it has to be in the light most favorable to the plaintiff. The question is if there's any evidence. And there was one evidence for the jury to conclude that the defendant's conduct was a proximate cause of her overdose. So I'm going to let the judge decide. Any questions? I actually agree with your argument that a judgment was answered on the special interrogatory and that when you filed your motion for a new trial, that you were asking for a new trial on all the issues. I agree with you. That's your argument, correct? Yes. And that the judge subsequently vacated that. And then because they filed the motion, and they subsequently filed the motion asking that the judgment notwithstanding, the verdict be entered. And the judge entered the judge's verdict. So you really never had the opportunity to address the separate issue, which Justice Hyman had some consent to it. But I want you to address the elephant, which I believe is in the room, and that is that Dr. Rickmeyer did not carry a ball into the end zone. And that's the argument that counsel has made. And I think that's really the elephant in the room, and I'd like to give you an opportunity to give that one last shot, because that's where the most difficulty may be for an instrument. I appreciate that. And let me try it a different way than what I've said before, to look at it a slightly different way. As the Aguilar case explains, and there's plenty of books that say that, that the expert only needs to indicate his opinion on direct examination. And then it's up to the cross-examiner to elucidate all of the facts and basis of the opinion. So the Aguilar report specifically says this, and there's several other questions that say this as well. Defendants did not do that here. Dr. Rickmeyer clearly said that in his opinion, she, he, Dr. Ruckel could have weaned her off or could have sent her to an addictionologist for detox, and that she would be off the drugs. So defendants are going, you didn't know exactly what an addictionologist would say. They never asked him. They never asked him this question, which is what was asked in Aguilar. But they don't have to ask. It's your version. It is. It's my version. Again, detox is the same as weaning. Either he can do it himself or he can send her to a detox. You don't need an addictionologist or detox to do that. Do you? And he said, I don't treat addictions. He said, I don't treat addictions. I personally don't treat addictions. I send them to detox. Okay. But that's his personal practice. He didn't elicit that from him. But that's what he said. He said, I could have weaned this. You know, let's go out there. He's talking about himself too. Wean or send her detox. Either way, again, that doesn't address addiction. You have to have an addictionologist, which he said he's not. The only thing that an addictionologist would add in this case is to explain exactly the minutiae of what the addictionologist can do. Do we need him in a medical department case? Respectfully, I don't believe that that minutiae is needed in this case. Because it's not a situation. All that Dr. Wilheimer has to say during his testimony is off of his opinions. He doesn't have to disclose all the bases for his opinions and all the facts. All he has to do is offer his opinions. And what he clearly said is that this injury would not have happened if the addiction wouldn't have been recognized and if Dr. Leifert wouldn't have weaned him off or Right there, he's kind of an addictionist. Right there you're saying, well, which is what Rick Meyer said, we've got to talk about the addiction. You can't address weaning and detox. It's not the same as dealing with the addiction. So you're saying, well, we don't need to look at the addiction. What I'm saying is that that is the course of treatment. Weaning or detox. Why didn't he mention addictionologist and say I'm not an addictionologist? During cross-examination, they asked him, do you personally treat addiction? And he said, no, he doesn't. That's the scope of the testimony. He is a pain management doctor who runs the pain management clinic at USC who testifies about how he works. He treats opioid patients. I understand. But the issue is not whether he's an addictionologist or not. The issue is if he testified, I would send someone to an addictionologist. Then the issue is to say to me, well, what would have happened? And then without knowing what would have happened, therefore, an expert would not know the causation of this problem. Except that Dr. Kramer did say that he sent him to detox and should be taking off the opioids. So what they're saying is that we don't have a situation like an Aguilera or Townsend. We don't have a situation where our expert said that he doesn't know what would happen at detox. I don't know what would happen. I have to defer to an addictionologist. I don't know what they would do. But that's not the testimony that's in this case. The testimony is that she gets off the opioids, either the defendant leaving her off or sending her to detox. There's no testimony like I don't know what happens next. The testimony is that you go to detox and she's off the medication. And they never elucidated from him any testimony like to say, well, doctor, do you know what an addictionologist would do? What specifically would he do? And to which he would answer, I don't know. I have to defer to an addictionologist. There was no testimony like that. All he had to do was present his opinion. So he looked at what the testimony that the jury was presented in the light most favorable to the plaintiff. And that was included that if she would have gone, if she had been leaving off the medication or if sent to detox, then the death wouldn't have occurred. And that's sufficient for the jury to combine with all the evidence, all the evidence, additional evidence, including, and really importantly, Jill's testimony, not testimony, Jill's medical records would show that Jill told Dr. Rothbaum 10 days before the overdose that she wanted off these medications. She wanted off the opioids. So, respectfully, there is sufficient evidence to classify them. We don't have an evidence gap like exists in the Aguilera, the Townsend case. So I hope I answered your question. Thank you very much for your time. Thank you, counsel. Now, the attorneys for court agreed that they'd stay for a few minutes to answer questions about the case. We're going to step down in a row and answer questions about the court for just a few minutes if you don't mind putting up with that. And then we'll leave and then you can have that. Okay? And in the meantime, this court is in recess.